United States District Court
Southern District of Texas
**ENTERED**
March 25, 2022
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

VIACOM INTERNATIONAL INC.,          §
                                    §
        Plaintiff,                  §
                                    §
v.                                  §     Civil Action No. H-21-2612
                                    §
PIXI UNIVERSAL, LLC d/b/a           §
KEFI HTX and SANJU CHAND,           §
                                    §
        Defendants.                 §

**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND
<u>ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION</u>**

Pending is Plaintiff's Motion for Preliminary Injunction (Document No. 9) (hereinafter, the "Motion"). Plaintiff Viacom International Inc. ("Viacom") and Defendant Pixi Universal, LLC ("Pixi") both waived an evidentiary hearing and agreed to the Motion being submitted to the Court on the pleadings and verified evidence.[1] Viacom and Pixi have submitted proposed findings of fact and conclusions of law.[2]

Defendant Sanju Chand, the owner of Pixi, had notice that Plaintiff's Motion would be submitted to the Court on the pleadings and verified evidence and that he had one week after Viacom served

---

[1] *See* Document No. 21; *see also* Document No. 24, Viacom's Proposed Order at 1; Document No. 26, Pixi's Proposed Order at 2.

[2] *See* Document Nos. 24, 26.

its proposed findings to file a response.[3]  Viacom served Chand
with its proposed findings of fact and conclusions of law on
November 3, 2021,[4] but he filed no response.   Chand has since
appeared, represented by Pixi's counsel, but still has not
responded to the pending Motion.[5]  Chand's failure to respond is a
representation of no opposition.[6]

Having considered the parties' submissions, the verified
evidence, and applicable law, the Court makes the following
findings of fact and conclusions of law and orders as follows.

---

[3] *See* Document No. 21; *see also* Document No. 24 at 1; Document
No. 26 at 1; Document No. 44.

[4] *See* Document No. 28.

[5] *See* Document Nos. 42-43.

[6] "Failure to respond to a motion will be taken as a
representation of no opposition." L.R. 7.4.

## FINDINGS OF FACT[7]

From a preponderance of the evidence submitted, the Court finds, for purposes of the pending Preliminary Injunction Motion, as follows:

### A. SpongeBob SquarePants

1.   Viacom is a major media company that owns and operates a portfolio of television networks, including Nickelodeon.[8]   In 1999, the animated television series "SpongeBob SquarePants" premiered on Nickelodeon.[9]   Since then, SpongeBob SquarePants has aired consistently and continuously on television and other platforms.[10]

2.   The SpongeBob SquarePants television series is the most widely distributed in Viacom history and has been the most-watched animated series for children for at least 17 years.[11]

3.   For decades, the SpongeBob SquarePants entertainment franchise has been immensely popular among both children and

---

[7] The references below to APPX are to Viacom's appendix at Document Nos. 9-15.

[8] APPX 173 ¶ 2.

[9] APPX 174 ¶ 4.

[10] Id.

[11] Id. at ¶ 5.

adults, and it has become an extremely valuable media franchise for Viacom that includes several spin-off series, three feature films, a Tony Award-winning Broadway musical, a comic book series, original music, video games, significant related merchandise, theme park rides, and theme hotels.[12]  The series has won numerous awards.[13]   SpongeBob SquarePants is primarily marketed toward children ages six and older, but given the franchise's tremendous success for more than twenty years, some of SpongeBob SquarePants' biggest fans are adults.[14]

4.   "SpongeBob SquarePants" chronicles the nautical adventures of SpongeBob SquarePants, a sea sponge, and takes place in the fantastical underwater city of "Bikini Bottom."[15]  As the series' opening song declares, SpongeBob SquarePants "lives in a pineapple under the sea," as shown below.[16]  The flowery shapes floating in the background behind SpongeBob and his home in the images below are ubiquitous in Bikini Bottom and therefore appear in much of Viacom's SpongeBob SquarePants-related marketing.[17]

---

[12] Id. at ¶ 6.

[13] APPX 175 ¶ 7.

[14] Id. at ¶ 9, APPX 197-198.

[15] APPX 175 ¶ 10.

[16] Id. APPX 175-76 ¶ 10.

[17] Id. at ¶¶ 10-11.

 

B. <u>Krusty Krab</u>

5.    SpongeBob SquarePants famously works as a fry cook for the "Krusty Krab," a fast-food restaurant in Bikini Bottom known for its "Krabby Patty" burgers.[18]  The Krusty Krab is so central to the SpongeBob SquarePants franchise that it has been featured heavily in more than 80% of the episodes of the animated television series, all three feature films, and the Broadway musical.[19]  For years, the Krusty Krab has been a household name, and instantly recognizable as being associated with Viacom and its SpongeBob SquarePants franchise.[20]

_____

[18] APPX 177 ¶ 13.

[19] <u>Id.</u>

[20] <u>Id.</u>  Pixi admits that the "Krusty Krab has become a well-known name among fans of the show."  Document No. 26, Pixi's Proposed Order at 2-3.

6.   Images depicting the Krusty Krab restaurant and its distinctive clamshell sign, menu, and interior decor are shown below.[21]

  

7.   In a famous sequence from the first season of the animated television series, viewers are informed by a "Krusty Krab Training Video" that the Krusty Krab was originally a retirement home called the "Rusty Krab" before Mr. Krabs converted it into a fast-food restaurant.[22]

8.   Viacom has spent millions of dollars advertising, promoting, and marketing the KRUSTY KRAB mark in connection with a variety of goods and services in the United States and globally.[23]

9.   *Time Magazine* named the Krusty Krab one of the eighteen most influential fictional companies of all time.[24]  The Krusty Krab has been featured in countless other unsolicited media,

---

[21] APPX 177-78 ¶ 14.

[22] APPX 179 ¶ 18.

[23] Id. ¶ 15.

[24] Id. ¶ 16.

including articles, newspapers, entertainment media, and others widely available throughout the United States.[25]

10.   Due to the popularity of the franchise, Viacom has been able to sell or license many products bearing SpongeBob SquarePants-related trademarks, including the KRUSTY KRAB mark.[26] Many of these products are associated with food and beverages, as shown below.[27]









---

[25] Id.

[26] APPX 181 ¶ 21.

[27] APPX 181-82 ¶ 21.

11.    Viacom and its licensees advertise and promote KRUSTY KRAB-branded products to fans in social media campaigns, including Twitter, Facebook, and Instagram, and on licensee websites.[28] Viacom and its affiliates also sell numerous items at SpongeBobShop.com, which includes a "Krusty Krab Shop" page.[29] Viacom's licensing regime in connection with the KRUSTY KRAB mark has generated millions of dollars for the company.[30]

12.    In 2019, Viacom brought the Krusty Krab to life at Comic-Con International: San Diego by creating an immersive experience featuring the restaurant, the clamshell sign, the floating flower shapes, and many other indicia of the franchise.[31]



---

[28] APPX 182 ¶ 22.

[29] Id., APPX 281-297.

[30] Id.

[31] APPX 179 ¶ 17.

C. Viacom's Trademarks

13.  Viacom is the record owner of three valid and subsisting trademark registrations for the KRUSTY KRAB mark.[32]  Viacom has actively and successfully policed the marketplace and enforced its rights against infringers of the KRUSTY KRAB mark.[33]

14.  Viacom uses other trademarks as well in connection with the SpongeBob SquarePants franchise, including SPONGEBOB, SPONGEBOB SQUAREPANTS, and KRABBY PATTIES.[34]  Viacom is the record owner of several valid and subsisting trademark registrations for the foregoing marks.[35]

D. Viacom's Copyrights

15.  Viacom is the sole owner of all copyrights in and to the creative aspects of the SpongeBob SquarePants franchise (the "Works").[36]  Viacom owns over 400 valid copyright registrations for

---

[32] APPX 182 ¶ 24, APPX 298-302, see also Document No. 26, Pixi's Proposed Order at 3 ("Viacom owns three federal registrations for the KRUSTY KRAB mark.").

[33] APPX 182 ¶ 23.

[34] APPX 183 ¶ 25, APPX 304-308.

[35] Id.

[36] APPX 183 ¶¶ 26-31, APPX 310-407; see also Document No. 26, Pixi's Proposed Order at 3 ("Viacom owns numerous copyright registrations for SpongeBob SquarePants related creative works.").

the Works.[37]  This includes copyrights covering episodes from the animated television series, feature films, two-dimensional drawings, and stylebooks featuring extensive artwork from the franchise.[38]

<u>Defendants' Activities</u>

16.  Defendant Chand owns and manages Defendant Pixi, which operates themed "pop-up" restaurants and bars in Houston, Texas.[39] In May 2021, Viacom discovered that Defendants had recreated the Krusty Krab in the form of a pop-up restaurant and bar called "The Rusty Krab."[40]  Defendants' designer of the restaurant, when interviewed on a Houston television channel, stated the aim was to give the pop-up the feel of being in Bikini Bottom:

> Lifelong dream of mine to be able to recreate something that was so nostalgic to my childhood . . . I really wanted to give it a feel of people actually being in Bikini Bottom.  And I believe we nailed it. . . . Everyone absolutely felt like they were in Bikini Bottom. . . . We wanted to make sure every single detail was absolutely correct. . . . I wanted to make people feel like they were in the infamous living room of SpongeBob.[41]

---

[37] <u>Id.</u>

[38] <u>Id.</u>

[39] APPX 023-024, APPX 155-56, APPX 171.

[40] APPX 002 ¶ 2, APPX 029-34 ¶ 2, APPX 087.

[41] APPX 049 ¶ 16.

17.   Owner Chand says he got the idea for the pop-up from his 9-year-old daughter, a huge SpongeBob fan.[42]  The pop-up includes recreations of various iconic SpongeBob locals where customers can pose for photos, including SpongeBob's living room and bedroom and Mrs. Puff's Boating School.[43]  The pop-up also includes a rendering of, and appearances by, SpongeBob for customer interaction and photographs.[44]  SpongeBob SquarePants video further plays on multiple screens throughout the pop-up.[45]  Defendants' Twitter page would show images such as this that depict the pop-up:[46]



**The Rusty Krab** @kefihtx · Jul 20

HOUSTON HAVE YOU LIVED OUT YOUR CHILDHOOD DREAMS YET!?

#BUCKETLIST #Houston #Texas #houstonfoodies



---

[42] APPX 156, 160.

[43] APPX 029-33, 063-64, 069, 157, 161.

[44] APPX 061, 065, 067, 070, 155, 160.

[45] APPX 059-60, 067, 071, 158.

[46] APPX 035.

11

18.   Defendants sold tickets to the public for entry during specific two-hour slots beginning in May 2021 at prices of $30.00 for ages 15 and older, $20.00 for kids 5-14, and free for kids under 5.[47]  The ticket price was for admission only; food and drink, including the "Krabby Patties," were sold separately.[48]

19.  Defendants' aim was nostalgic fun according to Defendants' Facebook posts:

> THIS IS AN UNFORGETTABLE NOSTALGIC EXPERIENCE THAT YOU DO NOT WANT TO MISS!!!  GET IN ON THE FUN NOW AND GRAB YOUR TICKETS TO THIS EVENT FOR ALL AGES NOW!"[49]

In promoting the pop-up in May, 2021, Chand admitted:

> The most important thing for me is for people to have fun here.  They spend a lot of money to come through. We have people traveling from out of state just to experience this[.] . . . I want them to be satisfied with the photo ops, the exhibits, the interactive games, the food and drinks – the whole enchilada.[50]

20.  The pop-up is not a parody or caricature of SpongeBob, the Krusty Krab, or the SpongeBob SquarePants universe.[51]

---

[47] APPX 053, 158.

[48] APPX 052, 066.

[49] APPX 038-39 ¶ 9.

[50] APPX 072-73, 158.

[51] *See, e.g.*, APPX 029-36 ¶¶ 2-5, APPX 037-39 ¶ 8-9, APPX 049 ¶ 16, APPX 051-53 ¶¶ 20-21, APPX 156.

21.   The pop-up does not mimic Viacom's intellectual property for purposes of commenting upon, or criticizing, the SpongeBob SquarePants franchise (in whole or in part).[52]

22.   The pop-up is not a joke nor is it a presentation of ridicule or satire.[53]

23.   Defendants have intentionally copied significant and detailed elements of the SpongeBob SquarePants series to attract customers drawn by fan nostalgia and goodwill and to profit therefrom.[54]

24.   Some consumers have publicly expressed confusion over whether The Rusty Krab is licensed by, or affiliated with, Viacom and the SpongeBob SquarePants franchise and have identified The Rusty Krab as the Krusty Krab.[55]

25.   Some customers of Defendants' pop-up have complained of horrible experiences at The Rusty Krab and expressed disgust at the purportedly unsafe and unsanitary conditions in the pop-up as well as the poor quality of the pop-up's services and the SpongeBob SquarePants recreations.[56]

---

[52] Id.

[53] Id.

[54] Id.

[55] APPX 036-39 ¶¶ 6-7, 10, APPX 048-49 ¶ 15, APPX 049 ¶ 17, APPX 050-51 ¶ 18, APPX 054-57 ¶ 23.

[56] APPX 039-47 ¶¶ 12-14, APPX 50 ¶ 17.

26.    When Viacom discovered this pop-up it demanded through counsel that Defendants cease operations using SpongeBob SquarePants intellectual property in connection with the restaurant, including all menus, signage, marketing and promotional materials, social media accounts, and websites associated with the restaurant.[57]

27.    Defendants refused to discontinue their use of the SpongeBob intellectual property,[58] and Viacom filed this suit to enjoin Defendants' actions.[59]

## CONCLUSIONS OF LAW

**The Court makes the following conclusions of law:**

### Jurisdiction

1.    The Court has jurisdiction over the parties and the subject matter of this case.  *See* 28 U.S.C. §§ 1331, 1367.[60]

### Evidentiary Issues

2.    The Court finds credible for purposes of the Motion the

---

[57] APPX 002 ¶ 2, Appx 009.

[58] APPX 002 ¶¶ 2-9.

[59] Document Nos. 1, 9.

[60] *See* Document Nos. 1, 25, 42.

14

Declarations of Dennis Wilson, H. Forrest Flemming, III, and Claudia Spinelli.

3.    The Declaration of Megan Matthees, a paralegal for the law firm Lloyd & Mousilli, PLLC, states in Paragraph 7, "I have read the factual statements set forth in Defendant Pixi Universal, LLC's Response to Plaintiff Viacom's Motion for Preliminary Injunction.  The factual statements set forth therein are within my personal knowledge and are true and correct."[61]    Not surprisingly, the attorney-in-charge who signed Defendants' Response did not verify the factual statements therein.  There is no basis shown in the evidence to suggest how her paralegal should have personal knowledge of all such matters as being factually true.  The Court is not persuaded by Ms. Matthees' testimony in paragraph 7.

4.    After the parties filed their proposed findings of fact and conclusions of law, Counsel for Pixi filed a letter stating that as of October 31, 2021, Pixi made the business decision permanently to close The Rusty Krab.[62]  According to counsel "Pixi agrees to never operate any restaurant related to, based on, or parodying SpongeBob SquarePants in the future."[63]  This letter is

---

[61] Document No. 19-1 at ¶ 7.

[62] Document No. 29.

[63] Id.

not part of the evidentiary record.  No evidence accompanied this letter.  Moreover, there is no proof that Defendant Chand, who owns and controls Pixi, has in any manner foresworn his operation of pop-ups infringing Viacom's intellectual property in the SpongeBob series by himself, or Pixi, or any other entity that he may use for business purposes.[64]

<u>Preliminary Injunction Standard</u>

5.   To obtain a preliminary injunction, Viacom must establish: (1) it is "likely to succeed on the merits," (2) it is "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [its] favor," and (4) "an injunction is in the public interest." <u>McDonald v. Longley</u>, 4 F.4th 229, 255 (5th Cir. 2021), *petition for cert. filed*, No. 21-800 (U.S. Nov. 30, 2021) (quoting <u>Winter v. Nat. Res. Def. Counsel, Inc.</u>, 129 S. Ct. 365, 374 (2008)).

6.   The decision to grant or deny preliminary injunctive relief is left to the sound discretion of the district court. <u>Miss. Power & Light Co. v. United Gas Pipe Line Co.</u>, 760 F.2d 618, 621 (5th Cir. 1985).

7.   An order of preliminary injunction can bind parties, their officers, and others who are "in active concert or

---

[64] *See* <u>id.</u>; *see also* Document No. 31.

16

participation" with those parties, but only those who receive actual notice of the injunction. FED. R. CIV. P. 65(d)(2).

## Likely to Succeed on the Merits

8.   Viacom predicates its preliminary injunction motion on two claims: federal trademark infringement under the Lanham Act and federal copyright infringement under the Copyright Act.

### A. Trademark Infringement

9.    To prevail on its trademark infringement claim, Viacom must show that (1) it owns a legally protectable mark and (2) Defendants' use of the mark creates a likelihood of confusion as to source, affiliation, or sponsorship. *See* Viacom Int'l v. IJR Capital Invs., L.L.C., 891 F.3d 178, 185 (5th Cir. 2018); Elvis Presley Enterprises, Inc. v. Capece, 141 F.3d 188, 193 (5th Cir. 1998).

10. Viacom has demonstrated an uncontroverted likelihood that it will succeed on the first element.  Viacom has produced three certificates of registration for the KRUSTY KRAB mark filed by Viacom in 2017.[65]  In addition, Viacom has submitted evidence that it has continuously used the KRUSTY KRAB mark in commerce as

---

[65] APPX 182 ¶ 24, APPX 298-302.

a    source    identifier    and    that    the    mark    has    acquired
distinctiveness.[66]   *See* <u>Viacom</u>, 891 F.3d at 185, 189, 191.

11.   The second element requires analysis of the digits of
confusion to assess whether Defendants' use of The Rusty Krab mark
creates a likelihood of confusion as to the pop-up's source,
affiliation, or sponsorship.   *See* <u>id.</u> at 191-92.   These factors
include:

> (1) the type of mark allegedly infringed;
>
> (2) the similarity between the two marks;
>
> (3) the similarity of the products or services;
>
> (4) the identity of retail outlets and purchasers;
>
> (5) the identity of the advertising media used;
>
> (6) the defendant's intent; and
>
> (7) any evidence of actual confusion.

<u>Id.</u>   The Court "must 'consider the marks in the context that a
customer perceives them in the marketplace.'"   <u>Id.</u> (quoting <u>Scott
Fetzer Co. v. House of Vacuums Inc.</u>, 381 F.3d 477, 485 (5th Cir.
2004)).   This includes whether the mark is used in parody.   *See*
<u>Lyons P'ship v. Giannoulas</u>, 179 F.3d 384, 389 (5th Cir. 1999).

12.   Parody is not a defense to trademark infringement, but
a factor to be considered when analyzing a likelihood of confusion.
<u>Elvis Presley</u>, 141 F.3d at 198.   While the use of a mark in parody,

---

[66] *See, e.g.*, APPX 177-79 ¶ 13-18.

weighs against a finding of a likelihood of confusion, the "cry of 'parody!' does not magically fend off otherwise legitimate claims of trademark infringement or dilution." Id. (quoting 4 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 31:153). As the Fifth Circuit stated, there "are confusing parodies and non-confusing parodies." Id. at 198-99 (citing cases). They have in common "an attempt at humor through the use of someone else's trademark." Id. at 199. A successful parody weighs against a likelihood of confusion because it sends the message that it is not the original and is a parody. Id. Thus, "*A non-infringing parody is merely amusing, not confusing.*" Id. (quoting 4 MCCARTHY, *supra* § 31:153) (emphasis in original).

13. A parody's need and justification to mimic the original derives from the parody's targeting of the original for comment or ridicule. Id. (citing Campbell v. Acuff-Rose Music, Inc., 114 S. Ct. 1164, 1176 (1994)). "If the original is not a target of the parody, the need to 'conjure up' the original decreases as the parody's aim moves away from the original." Id.

14. As found in Findings of Fact Nos. 20-23 above, Defendants do not use the pop-up or The Rusty Krab mark in parody. Moreover, neither the pop-up nor its name is used to comment, criticize, ridicule, or poke fun. To the contrary, its target is to replicate Viacom's intellectual property in such an authentic manner as to create--in the words of Defendants--"AN UNFORGETTABLE NOSTALGIC

19

EXPERIENCE" that would attract paying SpongeBob fans.  This is all to appropriate the goodwill of Viacom's intellectual property for the exclusive profit of Defendants.

15.  Neither the Krusty Krab nor SpongeBob and his universe are the target of any purported parody.

16.  Because parody is not a relevant factor here, it has no bearing on considering a likelihood of confusion in the analysis that follows.  *Compare* <u>Elvis Presley</u>, 141 F.3d at 200 (finding the parody factor irrelevant where the defendants' parody of the faddish bars of the sixties did not require the use of the Elvis Presley marks because the parody was not of Elvis but of cheesy sixties bars) *with* <u>Lyons P'Ship</u>, 179 F.3d at 388 (finding parody weighed against confusion where Barney (the purple dinosaur) was the "butt of a joke[,]" no other references were made to his mythical world, and "the humor came from the incongruous nature of [Barney's] appearance [at a sporting event being ridiculed and assaulted by a chicken mascot], not from an attempt to benefit from Barney's goodwill").

## *(1) The Type of Mark Allegedly Infringed*

17.  This first digit refers to the strength of Viacom's KRUSTY KRAB mark.  <u>Viacom</u>, 891 F.3d at 193 (citation omitted). "The more distinctive a mark, the stronger the mark."   <u>Id.</u> Generally, a stronger mark is entitled to more protection "because

20

here is a greater likelihood 'that consumers will confuse the junior user's use with that of the senior user.'" <u>Id.</u>  Pixi concedes that the KRUSTY KRAB mark is strong.[67] Indeed, the KRUSTY KRAB mark is strong, having acquired distinctiveness through secondary meaning.[68] <u>Id.</u>  This factor weighs in favor of a likelihood of confusion.  <u>Id.</u>

### (2) The Similarity Between the Two Marks

18.   In assessing the similarity of the marks, the Court considers the "marks' appearance, sound, and meaning" and asks "whether, under the circumstances of use, the marks are similar enough that a reasonable person could believe the two products have a common origin or association." <u>Viacom</u>, 891 F.3d at 193 (citation omitted).   Here, the marks as used are so similar in appearance (see pictures below), sound, and meaning that a reasonable person could quite well believe the two have a common origin or association.

---

[67] *See* Document No. 19, Response ¶ 4 ("The marks held by Viacom are strong by virtue of the age and popularity of the SpongeBob SquarePants series."); Document No. 26, Pixi's Proposed Order at 4 ("Because The Krusty Krab is a strong Mark, . . .").

[68] *See, e.g.,* APPX 177-79 ¶¶ 13-17, APPX 181-82 ¶¶ 21-22.



Viacom's Use

Defendants' Use

19.   Defendants' omission of "K" from the middle name in "The Krusty Krab," as if it might simply be a mistake, does not dispel a high likelihood of confusion given Defendants' use of the "K" in the distinctively misspelled last name, "Krab," all of which is displayed in virtually identical clam-shell signage with red whimsical lettering.   Viacom itself used "Rusty Krab" in its storyline before "Mr. Krabs" tweaked it to the almost identical "The Krusty Krab."   The second factor weighs in favor of a likelihood of confusion.

*(3) The Similarity of the Products or Services*

20.   As to the third factor, both marks identify restaurants: one, a fictional eatery and the other, an actual eatery with the same motif as the first.   The "danger of affiliation or sponsorship

confusion increases when the junior user's services are in a market that is one into which the senior user would naturally expand." Viacom, 891 F.3d at 194 (quoting Elvis Presley, 141 F.3d at 202). As recognized by the Fifth Circuit, "'today's consumers expect [cartoon character] endorsements and act favorably toward them' in the restaurant setting[.]"  Id. (quoting Conan Props., Inc. v. Conans Pizza, Inc., 752 F.2d 145, 150 (5th Cir. 1985)) (alteration in original).  Although Viacom has not developed the Krusty Krab restaurant based on the fictional eatery, Viacom or its subsidiary or licensee could quite naturally develop such a restaurant, as Viacom's affiliate did when it licensed Bubba Gump Shrimp Co., a fictional business in the movie "Forrest Gump," to build a chain of actual seafood restaurants.[69]  See id.  Given the success of SpongeBob and the thematic identity of the two restaurants, this third factor also weighs in favor of a likelihood of confusion. See id.; see also Elvis Presley, 141 F.3d at 203 (finding confusion likely where defendant enters a market the owner would naturally expand).

*(4) The Identity of Retail Outlets and Purchasers*

21.  "The greater the overlap between retail outlets and purchasers, the greater the likelihood of confusion." Viacom, 891

---

[69] APPX 173 ¶ 3.

F.3d at 194 (citation omitted).   Here, no overlap has been shown
as to the identity of retail outlets.   However, The Rusty Krab
targets SpongeBob fans, as does the show and its merchandise.
Given this identity of purchasers, this factor also weighs in favor
of a likelihood of confusion.

### (5) The Identity of the Advertising Media Used

22.   "The greater the similarity in the [advertising]
campaigns, the greater the likelihood of confusion." <u>Viacom</u>, 891
F.3d at 195 (citation omitted) (alteration in original).   Viacom
advertises and promotes its SpongeBob SquarePants franchise
through social media campaigns and on its websites, among other
channels.[70]   For example, Viacom and its licensees advertise and
promote KRUSTY KRAB-branded products in social media campaigns,
including Twitter, Facebook, and Instagram, and on licensee
websites.[71]   In the same manner, Defendants employ social media to
publish the SpongeBob likeness and name in advertising and
promoting The Rusty Krab to SpongeBob fans.[72]   The image below is
but one example of Defendants' advertising on the internet.

---

[70] *See, e.g.*, APPX 181 ¶ 20.

[71] *See, e.g.*, 182 ¶ 22.

[72] *Compare, e.g.*, APPX 034-36 ¶¶ 3-5, APPX 038-39 ¶ 9, APPX
051-53 ¶ 20, APPX 059-61, APPX 075, APPX 165-66 *with* APPX 174 ¶ 6,
APPX 181-82 ¶¶ 20-22.



23.    This  promotion  of  The  Rusty  Krab  alongside  Viacom's
SpongeBob makes confusion more likely.  This factor also weighs in
favor of a likelihood of confusion.

*(6) Defendants' Intent*

24.    The intent to confuse alone may justify a finding that
there  is  a  likelihood  of  confusion.   <u>Viacom</u>,  891  F.3d  at  195
(citation  omitted).   The  relevant  inquiry  is  whether  Defendants
intended to derive benefits from Viacom's reputation by using the
mark.   <u>Id.</u>  at  195-96.   Defendants  here  utilize  the  mark  to
capitalize  on  Viacom's  reputation  and  goodwill.[73]   Although
Defendants  at  some  point  in  time  placed  an  obscure  disclaimer  of
affiliation  in  tiny  print  at  the  bottom  of  their  website,  the
placement and type-size of the disclaimer was not designed to draw

---

[73] *See, e.g.*, APPX 029-36 ¶¶ 2-5, APPX 037-39 ¶ 8-9, APPX 049
¶ 16, APPX 051-53 ¶¶ 20-21, APPX 094-95, APPX 155-56.

one's attention and was highly unlikely to prevent consumer confusion.

25.  This tiny disclaimer at the end of Defendants' website promoting their pop-up restaurant looking like the Krusty Krab and filled with Viacom's SpongeBob images was not intended to prevent consumer confusion.[74]  This sixth factor also favors a finding of a likelihood of confusion.

### (7) Evidence of Actual Confusion

26.  Evidence of actual confusion is the "best evidence of a likelihood of confusion."  Viacom, 891 F.3d at 197 (citation omitted).  This evidence may be anecdotal instances of consumer confusion, even if quickly dispelled.  Id.  The Fifth Circuit has set the bar low, requiring very little proof of actual confusion to prove infringement; just a single known incident of actual confusion can be enough.  Id. at 198 (citation omitted); Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc., 851 F.3d 440, 457 (5th Cir. 2017).  Viacom has produced evidence of numbers of instances of actual consumer confusion as to the pop-up's source,

---

[74] Compare APPX 169 with APPX 036-39 ¶¶ 6-7, 10, APPX 048-49 ¶ 15, APPX 049 ¶ 17, APPX 050-51 ¶ 18, APPX 054-57 ¶ 23; see also APPX 085 (evidence of another small print disclaimer in white font).

affiliation, or sponsorship.[75]   This factor strongly supports a finding of a likelihood of confusion.

27.   "By creating a connection in the consumer's mind between [The Rusty Krab] and The Krusty Krab from 'SpongeBob SquarePants,' there is an impermissible likelihood of confusion as to source, affiliation, or sponsorship."[76] Viacom, 891 F.3d at 198.  Viacom has demonstrated a likelihood that it will succeed on the second element of its trademark infringement claim.

28.   The Fifth Circuit has previously recognized that "third parties cannot appropriate the goodwill and reputation of The Krusty Krab by naming a restaurant The Krusty Krab absent a showing that the restaurant was developed in a context sufficient to avoid any likelihood of consumer confusion." Id.  This holding applies no less to The Rusty Krab, a restaurant specifically conceived, designed and built intentionally to copy the SpongeBob SquarePants eatery.  Viacom has demonstrated a likelihood that it will prevail on its trademark infringement claim.

## B. Copyright Infringement

29.   Copyright protection subsists in original works of authorship fixed in tangible mediums of expression, including

---

[75] APPX 036-39 ¶¶ 6-7, 10, APPX 048-49 ¶ 15, APPX 049 ¶ 17, APPX 050-51 ¶ 18, APPX 054-57 ¶ 23.

[76] APPX 049 ¶ 16.

pictorial, graphic, sculptural, motion pictures, and other audiovisual works. 17 U.S.C. § 102(a). Subject to certain enumerated exceptions, the owner of a copyright has the exclusive right to reproduce copies, to prepare derivative works, and to perform publicly a copyrighted motion picture or other audiovisual work. Id. at § 106(1), (2), (4). Anyone who violates any of the exclusive rights of the copyright owner is an infringer. Id. at § 501(a).

30. To prove copyright infringement, Viacom must prove "(1) ownership of a valid copyright, and (2) copying [by the defendant] of constituent elements of the work that are original." See Gen. Universal Sys., Inc. v. Lee, 379 F.3d 131, 141 (5th Cir. 2004) (quoting Feist Publ'ns., Inc. v. Rural Tel. Serv. Co., 111 S. Ct. 1282, 1296 (1991)) (alteration in original). Neither of these elements is in dispute.[77]

31. Viacom is the sole owner of all copyrights in and to the creative aspects of the SpongeBob SquarePants franchise and has

---

[77] See, e.g., Document No. 19, Response at ¶ 20 ("Pixi readily admits that Viacom holds valid copyrights for the SpongeBob SquarePants television series, films, character designs, and artwork. Defendant also admits to operating a restaurant in Houston, Texas bearing a substantial likeness to a restaurant featured in the SpongeBob SquarePants television series, the Krusty Krab."); Document No. 26, Pixi's Proposed Order at 3-4 (admitting that "Viacom owns numerous copyright registrations for SpongeBob SquarePants-related creative works" and that "The Rusty Krab has taken SpongeBob SquarePants motifs").

over 400 valid copyright registrations for the Works.[78]   Defendants copied various elements of the Works to recreate Viacom's Krusty Krab and other iconic SpongeBob locals, including SpongeBob's living room and bedroom and "Mrs. Puff's Boating School."[79]   They played footage from the series in the restaurant; placed two-dimensional images of SpongeBob in the restaurant and in marketing materials; copied the Krusty Krab's clam-shaped sign; used costumes featuring the exact likeness of SpongeBob and Patrick Star (another character) inside the restaurant and in marketing materials; and painted actual backgrounds from the franchise onto walls and tables in the restaurant.[80]   Viacom has demonstrated a likelihood that it will succeed on the copyright infringement elements.

32.   The sole defense raised by Pixi is the affirmative defense of fair use under 17 U.S.C. § 107.   *See* Campbell v. Acuff-Rose Music, Inc., 114 S. Ct. 1164, 1177 (1994).   Generally, the fair use of a copyrighted work "for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright."   17 U.S.C. § 107.   Four factors are considered by

---

[78] APPX 183 ¶¶ 26-31.

[79] APPX 029-34 ¶ 2.

[80] Id., APPX 035-36 ¶ 5, APPX 037-38 ¶ 8.

the Court in determining whether a use is fair: "(1) the purpose and character of the use; (2) the nature of the copyrighted work; (3) the substantiality of the portion used in relation to the copyrighted work as a whole; (4) the effect on the potential market for or value of the copyrighted work." Harper & Row Pubs., Inc. v. Nation Enters., 105 S. Ct. 2218, 2230-31 (1985).

### (1) The Purpose and Character of the Use

33.   The first factor considers "the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes[.]" 17 U.S.C. § 107(1). Here, Defendants' use of Viacom's copyrighted works is wholly commercial in nature.   The commercial nature of Defendants' use weighs against a finding of fair use. See Campbell, 114 S. Ct. at 1174; Harper & Row, 105 S. Ct. at 2231. The commercial nature is, however, just one fact to be weighed along with others. See id.

34.   To that end, the Court must further consider "whether and to what extent [Defendants' work] is 'transformative.'" Campbell, 114 S. Ct. at 1171.   The more transformative the new work, the less significant commercialism may weigh against a finding of fair use.   Id.

35.   For purposes of copyright law, "the heart of any parodist's claim to quote from existing material, is the use of some elements of a prior author's composition to create a new one

30

that, at least in part, comments on that author's works." Id. at 1172. If the new work "has no critical bearing on the substance or style of the original composition, which the alleged infringer merely uses to get attention or to avoid the drudgery in working up something fresh, the claim to fairness in borrowing from another's work diminishes accordingly (if it does not vanish), and other factors, like the extent of its commerciality, loom larger." Id. "The threshold question when fair use is raised in defense of parody is whether a parodic character may reasonably be perceived." Id. at 1173.

36.   The credible evidence on this Motion establishes no parodic character in The Rusty Krab. The Rusty Krab cannot reasonably be perceived as commenting on Viacom's Works or criticizing them in any respect or degree. Pixi had no intention to ridicule or criticize Viacom's original work but rather sought to embrace it, to replicate it, and to profit from it.

37.   Defendants have not added "something new, with a further purpose or different character, altering the first with new expression, meaning, or message[.]" See id. at 1171 (discussing transformative uses); Dr. Seuss Enters., L.P. v. ComicMix LLC, 983 F.3d 443, 453 (9th Cir. 2020), cert. denied, 141 S. Ct. 2803 (2021) (recognizing that efforts to leverage an original's characters without new purpose or giving the original new meaning is not transformative). To the extent the Works were transmitted by

Defendants into a different medium, it was for the same purpose--light-hearted entertainment--with similar expression, meaning, and message. *See* Disney Enterprises, Inc. v. VidAngel, Inc., 869 F.3d 848, 861 (9th Cir. 2017) (affirming a finding of no transformative use where the new work was for the same entertainment purpose); Balsley v. LFP, Inc., 691 F.3d 747, 758-59 (6th Cir. 2012) (recognizing that retransmitting in a different medium is not transformative).

38.  Pixi's post-hoc characterization of The Rusty Krab as parody is not supported by the evidence.  The first factor weighs decidedly against a finding of fair use.  *See* Castle Rock Ent., Inc. v. Carol Pub. Grp., Inc., 150 F.3d 132, 143-44 (2d Cir. 1998) (rejecting fair use defense for a book containing trivia questions about the show *Seinfeld*; the book's purpose--to "repackage *Seinfeld* to entertain *Seinfeld* viewers"--was minimally transformative); *see also* Dr. Seuss Enters., 983 F.3d at 452 (holding that the book *Boldly* that did not critique or comment on *Go!* was not a parody, even though "it situated the 'violent, sexual, sophisticated adult entertainment' of Star Trek 'in the context of [Dr. Seuss]' to create a 'funny' book" (alteration in original)).

*(2) The Nature of the Copyrighted Work*

39.    The  second  factor  "calls  for  recognition  that  some works are closer to the core of intended copyright protection than others,  with  the  consequence  that  fair  use  is  more  difficult  to establish when the former works are copied."  Campbell, 114 S. Ct. at  1175.   "In  general,  fair  use  is  more  likely  to  be  found  in factual  works  than  in  fictional  works."  Stewart v. Abend, 110 S. Ct.  1750,  1769  (1990); *see also* Harper & Row, 105 S. Ct. at 2231 ("The  law  generally  recognizes  a  greater  need  to  disseminate factual  works  than  works  of  fiction  or  fantasy.").   Viacom's copyrighted works here are published, creative, fictional works.

40.    The  fictional,  imaginative  nature  of  Viacom's  works weighs against a finding of fair use.  *See* Stewart, 110 S. Ct. at 1769; Castle Rock, 150 F.3d at 144 ("the fictional nature of the copyrighted  work  remains  significant  in  the  instant  case,  where the  secondary  use  is  at  best  minimally  transformative");  Pierson v. DoStuff Media, LLC, No. A-19-CV-00435-LY, 2019 WL 5595236, at *4  (W.D.  Tex.  Oct.  29,  2019),  *report and recommendation adopted*, No. A-19-CV-00435-LY, 2019 WL 12469795 (W.D. Tex. Nov. 25, 2019) (holding  that  the  fact  the  creative  works  "have  been  published does  not  tip  the  scale  in  favor  of  fair  use  here").

*(3) The Substantiality of the Portion Used in Relation to
the Copyrighted Work as a Whole*

41.  As to the third element, Defendants used the copyrighted works' unique universe and characters in creating and advertising The Rusty Krab.  Defendants "wanted to make sure every single detail was absolutely correct" so people would feel they were in Bikini Bottom.[81]  Pixi admits that "it is clear [The Rusty Krab] uses a number of elements and motifs from the SpongeBob SquarePants 'universe.'"  *See, e.g.*, Dr. Seuss Enters., 983 F.3d at 458 (rejecting similar argument).  While Defendants did not copy all details and characters of the SpongeBob series, or specific storylines from the series, it carefully copied central, principal characters and iconic locals and backgrounds from the series. Defendants' use has been substantial.  *See* Dr. Seuss Enters., 983 F.3d at 457-458 (recognizing that taking the heart--the most valuable and pertinent portion--of the work tilts the third factor against fair use).  The substantiality of Defendants' use of the heart of Viacom's work weighs against a finding of fair use.

*(4) The Effect on the Potential Market For
or Value of the Copyrighted Work*

42.  The final factor requires the Court to consider "the extent of market harm caused by the particular actions of the

---

[81] APPX 049 ¶ 16.

alleged infringer" and "whether unrestricted and widespread conduct of the sort engaged in by the defendant would result in a substantially adverse impact on the potential market for the original" as well as the market for derivative works. Campbell, 114 S. Ct. at 1177 (citations and quotation marks omitted). "Since fair use is an affirmative defense, its proponent would have difficulty carrying the burden of demonstrating fair use without favorable evidence about relevant markets." Id.

43. Although bearing the burden of proof, Defendants produce no evidence that their pop-up would not impact the potential market for derivative immersive works, similar to their pop-up. *See* Dr. Seuss, 983 F.3d at 459 (recognizing that the Supreme Court has placed the burden on the proponent to demonstrate the lack of effect on the market). Unlike parody, criticism, scholarship, news reporting, or other transformative uses, The Rusty Krab "substitutes for a derivative market that a television program copyright owner such as" Viacom "'would in general develop or license others to develop.'" *See* Castle Rock, 150 F.3d at 145 (quoting Campbell, 114 S. Ct. at 1164)). Because The Rusty Krab borrows exclusively from the SpongeBob copyrighted works "and not from any other television or entertainment programs, [The Rusty Krab] is likely to fill a market niche that [Viacom] would in general develop." Id. Although Viacom to date has evidenced only some interest in exploiting this market of derivative works based

on the copyrighted works (such as by creating an immersive Krusty Krab experience for SpongeBob enthusiasts like it did at Comic-Con International: San Diego), copyright law respects the owner's creative and economic choice. *See* id. at 145-46. "It would ... not serve the ends of the Copyright Act--*i.e.*, to advance the arts --if artists were denied their monopoly over derivative versions of their creative works merely because they made the artistic decision not to saturate those markets with variations of their original." Id. (citation omitted; alteration in original).  In this context The Rusty Krab affects the potential market for Viacom's possible venture into derivative immersive works.  This factor weighs against a finding of fair use. *See* id.

44.  In sum, Viacom has demonstrated a likelihood that the evidence will not support a fair use affirmative defense and that Viacom has shown a substantial likelihood of prevailing on the merits of its copyright infringement claim.  Dallas Cowboys Cheerleaders, Inc. v. Scoreboard Posters, Inc., 600 F.2d 1184, 1188 (5th Cir. 1979) ("A preliminary injunction may issue, however, despite the existence of a plausible defense, as long as the movant demonstrates a substantial likelihood of success.  Nothing beyond an unelaborated invocation of the term 'parody' was ever put before the district court, and we cannot fault the court if it found the simple allusion to the concept of parody insufficient to shift the calculus of probabilities in the defendants' favor.").

Likely to Suffer Irreparable Harm in the
<u>Absence of Preliminary Relief</u>

45.   The Court finds that absent injunctive relief, Viacom is likely to suffer irreparable harm.  First, a plaintiff seeking a preliminary "injunction shall be entitled to a rebuttable presumption of irreparable harm" upon a finding of a likelihood of success on the merits for a violation of 15 U.S.C. § 1125(a).  *See* 15 U.S.C. § 1116(a); <u>Bisous LLC v. The Cle Grp., LLC</u>, No. 3:21-CV-1614-B, 2021 WL 3618042, at *12 (N.D. Tex. Aug. 16, 2021) (Boyle, J.) (finding plaintiff entitled to the statutory presumption); <u>Suzie's Brewery Co. v. Anheuser-Busch Cos., LLC</u>, 519 F. Supp. 3d 839, 854-55 (D. Or. 2021) (same).  Because Viacom has shown a likelihood of success of the merits on its motion for preliminary injunction to enjoin Defendants' violation of 15 U.S.C. § 1125(a), Viacom is entitled to the benefit of the rebuttable presumption provided for in § 1116(a).  *See* <u>id.</u> Defendants have not rebutted that presumption.

46.   In addition, even without the rebuttable presumption, Viacom's presents credible testimony of Claudia Spinelli, Viacom's Senior Vice President of Animation Development, Nick Animation, and of H. Forrest Flemming, III, along with proof of Defendants' actions and the reviews of The Rusty Krab, from which it is established that Viacom is likely to suffer irreparable injury if

37

Defendants' infringement is not enjoined.[82]  These irreparable injuries include harm to its goodwill and to the value of its trademarks and copyrights and the loss of control over its brand and the quality of goods and services furnished thereunder.  There is no verified evidence in the preliminary injunction evidentiary record[83] of voluntary cessation nor evidence that Defendants' wrongful conduct cannot reasonably be expected to recur if not enjoined.[84]  Irreparable harm has been established.  *See, e.g.,* Paulson Geophysical Servs., Inc. v. Sigmar, 529 F.3d 303, 313 (5th Cir. 2008); Choice Hotels Int'l, Inc. v. Patel, 940 F. Supp. 2d 532, 542-53 (S.D. Tex. 2013) (Costa, J.).

<u>The Balance of Equities Tips in Viacom's Favor</u>

47.  The equities weigh sharply in Viacom's favor.  Pixi argues that an injunction would work grave harm upon Pixi and its 50-odd employees, but presents no credible evidence to support this argument.  A preliminary injunction does not prevent Defendants from continuing to use the space as a restaurant and bar; it simply prevents Defendants from continuing to violate Viacom's rights, "which is really 'no harm at all.'"  McDonald, 4

---

[82] APPX 183-86 ¶¶ 32-40, APPX 029-57 ¶¶ 2-23.

[83] *See* Document Nos. 9-15, 19, 20.

[84] *Cf.* APPX 023-24.

F.4th at 255 (quoting <u>Christian Legal Soc'y v. Walker</u>, 453 F.3d 853, 867 (7th Cir. 2006)).  This element has been established.

<u>An Injunction is in the Public Interest</u>

48.    Finally, the Court finds that granting the preliminary injunction will serve the public interest by protecting consumers from confusion and advancing the purposes of the Lanham Act and Copyright Act in restraining future infringement prohibited by the Acts.  <u>Choice Hotels</u>, 940 F. Supp. 2d at 543; <u>Malibu Media, LLC v. Escobar</u>, No. CV H-18-1042, 2019 WL 1003391, at *4 (S.D. Tex. Feb. 28, 2019) (Miller, J.); *see also* 15 U.S.C. §§ 1116, 1125; 17 U.S.C. § 502(a).  Without enjoining Defendants from further infringing Viacom's exclusive rights in its copyrighted works and trademarks, Viacom would remain vulnerable to continued infringement by Defendants.  Viacom is entitled to injunctive relief.

**If any of the foregoing Findings of Fact constitute Conclusions of Law, they are adopted as such; and if any of the foregoing Conclusions of Law constitute Findings of Fact, they are adopted as such.**

**ORDER**

For the reasons set forth in the foregoing Findings of Fact and Conclusions of Law, it is

ORDERED that Plaintiff's Motion for Preliminary Injunction

(Document No. 9) is GRANTED.   A separate Order of Preliminary Injunction will be issued.

It is SO ORDERED.

The Clerk will enter this Order and provide a correct copy to all parties.

SIGNED at Houston, Texas, on this 25TH day of March, 2022.

EWING WERLEIN, JR.
UNITED STATES DISTRICT JUDGE